RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE 3 / 16 / 12

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

NANCY GUILLOT UTLEY,                    CIVIL ACTION
              Appellant                 1:11-cv-00931

VERSUS                                  JUDGE DEE D. DRELL

MICHAEL J. ASTRUE,                      MAGISTRATE JUDGE JAMES D. KIRK
              Appellee

<u>REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE</u>

Nancy Guillot Utley ("Utley") filed applications for social security disability insurance benefits ("DIB") (Tr. p. 108) and supplemental security income ("SSI") benefits (Tr. p. 115) on April 20, 2007, alleging a disability onset date of March 21, 2007 due to back/spinal cord injury (Tr. p. 139); those applications were denied by the Social Security Administration ("SSA") (Tr. p. 53). Utley filed a second application for SSI and DIB on December 2, 2008 (Tr. pp. 118, 122); those applications were also denied by the SSA (Tr. pp. 58, 62).

A de novo hearing was held on October 22, 2009 before an administrative law judge ("ALJ"), as which Utley, her attorney and a vocational expert ("VE") appeared. The ALJ found that, although Utley suffers from severe impairments of status post L1 burst fracture with fusion, chronic pain and depression, she had the residual functional capacity to perform sedentary work with an option to sit/stand every thirty minutes to one hour, that involves working with things rather than people, and that does not involve direct contact with the public (Tr. p. 18) and, therefore, Utley was not disabled at any time through the date of the ALJ's decision

March 3, 2010 (Tr. p. 22).

Utley requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 1), and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Utley next filed this appeal for judicial review of the Commissioner's final decision. Utley raises the following issues on appeal:

> 1. The ALJ failed to discuss why she did not find that Utley meets the requirements of 20 C.F.R. part 404, Subpart P, Appendix 1, Section 1.04.
>
> 2. The vocational testimony does not carry the Commissioner's burden of proof at the final step in the sequential evaluation process.

The Commissioner filed a brief in response to Utley's appeal (Doc. 10), to which Utley replied (Doc. 11). Utley's appeal is now before the court for disposition.

## Eligibility for Benefits

To qualify for SSI benefits, a claimant must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. 1381(a). Eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. 1382(a). To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than 12 months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 42 U.S.C.

1382(a)(3).

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. 416(i), 423. Establishment of a disability is contingent upon two findings. First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. 423 (d)(1)(A). Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. 423(d)(2).

<u>Summary of Pertinent Facts</u>

1. Medical Records

In May 2003, Utley, then 32 years old, was treated in the hospital for back pain due to having been flipped off of a 4-wheeler ATV late at night (Tr. p. 188). A neurologically intact L1 burst fracture was diagnosed (Tr. p. 188-192), and Utley underwent an L1 corpectomy with T12 to L2 fusion using cages (retroperitoneal corpectomy) with Dr. Anil Nanda, a neurosurgeon (Tr. pp. 212, 216-218, 243-244). In November 2003, Utley underwent surgery to repair a mild cage displacement which was causing her back pain (Tr. pp. 214, 220-223, 236-242). On discharge, Dr. Nanda found Utley had "some mild spine" but no motor or sensory deficit (Tr. p. 241).

In January 2004, Utley was again evaluated by Dr. Nanda, who

3

found Utley had improved moderately following her surgery but still had some back pain going down her leg; Dr. Nanda found Utley had excellent fusion with good placement of the screws (Tr. p. 231).

In August 2004, Dr. Nanda noted Utley's complaints of some back pain going down her left leg, but found Utley's cranial nerves were normal, she had good motor strength in her upper and lower extremities with normal reflexes, and a myelogram/CT scan showed excellent decompression with no nerve root compromise (Tr. p. 230).

In October 2004, Utley was treated for depression at Glenwood Regional Medical Center for three days (Tr. pp. 377-384). Utley was diagnosed with major depression, single episode without psychotic features and found to have moderate stressors (Tr. p. 378). Utley was prescribed Effexor, Lortab, Soma, and Celebrex (Tr. p. 379).

In April 2007, CT scans showed post-surgical changes to T12-L1 and L2, but no significant compression (Tr. pp. 198-204). In January 2008, Utley went to the emergency room for nausea reportedly due to back pain (Tr. p. 312), and she again reported back pain in July 2008 (Tr. p. 324). A series of x-rays and CT scans showed a stable fusion and no acute lumbar spine findings in May 2008 (Tr. p. 256), a stable lumber spine and no acute changes to explain Utley's radiculopathy in June 2008 (Tr. pp. 257-258, 322-323), some degenerative changes at C5-C6, but unremarkable lower lumbar levels and sacrum in October 2008 (Tr. pp. 249, 251), and lower cervical arthritic findings, but overall negative CT scan of the cervical spine in November 2008 (Tr. p. 259).

4

In September 2008, Utley reported ongoing low back pain which radiated into her legs (Tr. p. 321). In October 2008, Utley complained she felt her back "pop" when she got up, which caused numbness and tingling down her left leg, and she was diagnosed with a strain (Tr. p. 248).

Utley was evaluated by Dr. Gerald J. Leglue, Jr., a physical medicine and rehabilitation doctor, in November 2008 (Tr. pp. 262-280). Utley reported neck pain, low back pain and headaches after she was involved in an automobile accident (Tr. p. 279). Dr. Leglue diagnosed cervical strain, bilateral rotator cuff strain, post-traumatic headaches, and possible lumbar radiculopathy (Tr. p. 280). Dr. Leglue determined that Utley was unable to tolerate cervical therapy secondary to pain, and that she also had significant back and left leg pain and paresthesias (Tr. p. 278). Dr. Leglue prescribed Lyrica for Utley's apparent neuropathic pain, refilled her Lortab prescription, and ordered an MRI (Tr. pp. 278, 280). Utley's cervical spine MRI on November 12, 2008 showed some arthritis in the lower cervical spine, but overall it was negative (Tr. p. 320).

In February 2009, Utley underwent a disability determination examination by Dr. Meredith Dewitt, an infectious disease specialist (Tr. pp. 339-343). Dr. Dewitt concluded that Utley has some back pain, as supported by her decreased range of motion and positive straight leg raises on the left and some difficulty with ambulation, but found there was no clinical evidence to support functional limitations from her back pain (Tr. p. 343).

5

Dr. A. Edward Dean, an orthopedic surgeon, reviewed Utley's medical records and filled out a residual functional capacity assessment in February 2009 (Tr. pp. 344-353).   Dr. Dean found that Utley can lift/carry up to 20 pounds occasionally and up to ten pounds frequently, stand/walk up to at least two hours in an eight hour day, sit up to six hours in an eight hour day, and can do unlimited pushing and pulling with her hands and feet (Tr. p. 347).   Dr. Dean further found that Utley should never climb ladders, ropes or scaffolds, but can occasionally climb rams and stairs, balance, stoop, kneel, crouch, and crawl (Tr. p. 348).

Utley was examined by Dr. J. Kevin Jackson, a neurologist, who diagnosed low back pain, neck pain, akathisia (uncontrollable motor restlessness), and generalized anxiety disorder, and prescribed Percocet, Alprazolam, and Soma in June 2009 (Tr. pp. 369-370).   An EMG and a nerve conduction study in July 2009 were normal for Utley's upper extremity EMGs, while her lower extremity EMGs were consistent with an S1 radiculopathy (Tr. p. 361).   Utley's Percocet prescription was discontinued and she was prescribed Lortab (Tr. p. 365).   In September 2009, Dr. Jackson prescribed Lyrica, Soma, Lortab, and Alprazolam (Tr. p. 361).

In July 2009, Dr. David Guillot examined Utley and prescribed Effexor, Bactrim, Bactob, and Ultram (Tr. p. 390).   In March 2010, Dr. Guillot prescribed Ambien and made an appointment for her at a pain management center[1] (Tr. p. 389).   In April 2010, Utley

---

[1] There are no medical records from a pain management center in the administrative record.

6

reported gaining 15 pounds in one month due to Lyrica, to that was
decreased (Tr. p. 388).

## 2. Administrative Hearing

Utley's administrative hearing was held on October 22, 2009,
at which she appeared with her attorney and a vocational expert
(Tr. p. 397). Utley testified that she is taking Xanax, Soma,
Lyrica, Lortab, Neurontin, and Nexium (Tr. p. 401). Utley
testified she was 38 years old, 5'4" tall, and weighed 125 pounds
(Tr. p. 403). Utley testified that she lived in a house with her
husband, and she received child support back pay (her child was 18
years old) (Tr. p. 403). Utley testified that she had smoked since
she was 17 years old, but was trying to quit smoking and was down
to half a pack per day (Tr. p. 404). Utley testified that she has
a tenth grade education and a GED, and has taken a "tax class" (Tr.
p. 404). Utley testified that she can read, write, and do basic
math (Tr. p. 405). Utley does not drive because her leg "gives
out" and goes numb, so her family does not let her drive (Tr. p.
405). Utley testified that she allowed her driver's license to
expire and has not driven in four to five years (Tr. pp. 405-406).

Utley testified that she last worked in about 2007, in a
convenience store as a cashier, stock clerk, and cleaner; she quit
because she could not stand or sit and could not lift things (Tr.
p. 406). Utley worked at a junk yard, a uniform store (for one
week), and rented strollers in a mall in 1995, did temporary
clerical work in 1999, inventory control work at the food bank in
2000, office work in 2001 through 2002, did seasonal work at a

check cashing business in 2001 and 2002, worked as a convenience store cashier and a vision store technician in 2006, and worked at the "IAC" store in 2007 (Tr. pp. 406-410, 435). Utley testified that she has not worked since March 2007 (Tr. p. 410).

Utley testified she was recently diagnosed with carpal tunnel syndrome in her left hand (Tr. p. 411), which causes her to drop things, and her left hand tingles and is numb so she cannot use a computer (Tr. p. 413). Utley also testified that "her leg" gives out often (four times that month) and causes her to fall (Tr. p. 4130. Utley testified that she has "spinal leakage" and has to have the fluid drained off (Tr. p. 413). Utley testified that, when she falls, she swells up (Tr. p. 413).

Utley testified she had a back fusion in 2003 from T12 to L3, with a titanium cage (Tr. p. 414). Utley testified she is in bed most of the time due to pain; she testified that the cage "collapsed" three months after it was put in and so a second surgery was done to replace hardware and reposition the cage (Tr. pp. 414-415). In 2008, the cage did not have any hardware failure (Tr. p. 414).

Utley testified that pain prevents her from being able to do things (Tr. pp. 416-417). Utley testified that her back pain radiates into her legs, mostly the left leg (Tr. p. 417), and that her left foot is numb (Tr. pp. 417-418). Utley testified that, on a scale of one to ten, her pain can be about an eight with medication, but that she does not have to take medication all the time (Tr. p. 420). Utley testified that she has about five bad

8

days a week; on a bad day, she stays in bed (Tr. p. 420).  On a good day, Utley gets up, reads to the children, sits on the couch and folds clothes, does a little dusting, and goes to the grocery store about once a month, where  she uses a motorized wheelchair (Tr. pp. 421-422).  Utley testified that her husband does most of the  housework  because  she  falls  a  lot  (Tr.  p.  421).  Utley testified she can carry a bag with bread or eggs (up to about five pounds) and can lift a gallon of milk (Tr. pp. 421-422).  Utley testified that she visits her grandmother about every two months, people visit her at home every day, she does not go to church, and she does not have any hobbies (Tr. pp. 422, 424).  Utley testified that she is able to take care of her personal needs unless she falls; Utley testified that she has a walker that is broken and she has a cane, but she did not take it to the hearing (Tr. p. 423). Utley testified that she watches television about twelve hours a day  (Tr.  p.  423).   Utley  also  testified  that  she  reads  the newspaper if someone gives her one (Tr. p. 424).

Utley testified she has problems sleeping because her legs move all night, and she lays there and thinks about things (Tr. p. 424).  Utley testified that she sleeps four to five hours at night and four to nine hours during the day (Tr. pp. 424-425).

Utley testified that her depression also prevents her from working, and she takes Effexor for depression (Tr. p. 418).  Utley testified that two of her children had died (Tr. pp. 418-419). Utley  testified  she  had  been  seeing  Dr.  Jackson,  a  neuro-psychiatrist, for six months, and had been to family counseling for

9

about a year, as well as counseling at her church (Tr. p. 419).

Utley testified that she can walk ten to fifteen minutes on a good day, and can walk two minutes on a bad day (Tr. p. 427). Utley further testified she can stand for about two minutes on a good or bad day, sit about ten minutes, and cannot walk up steps (Tr. p. 427). Utley testified that she can reach forward and overhead, and she can lean forward and pick something up from a table (Tr. p. 428). Utley testified she can pick up a gallon of milk (which weighs eight pounds) (Tr. p. 428). Utley testified that she cannot kneel or squat because she has a problem with both getting down and getting back up (Tr. p. 428). Utley testified that she can hold things with her right hand and can button, snap or nip things with either hand, but cannot pick up small things with her left hand (Tr. p. 429). Utley testified she can concentrate and pay attention unless she is feeling very depressed, and can follow simple one and two-step instructions (Tr. p. 429). Utley testified that she feels very depressed about four days a week (Tr. p. 429).

Utley testified that she thinks she can get along with a supervisor (Tr. pp. 430-431), she can get along with coworkers unless she is very depressed (then she has anger problems), and she can interact with the public (Tr. p. 431). Utley testified that she does not like crowds very much, and has problems working around dust (Tr. p. 432). Utley testified that falling down has aggravated her sciatic nerve problem (Tr. p. 432). Utley also testified that she was in two automobile accidents-one last year

10

and one the year before (Tr. pp. 432-433). Dr. Leglue treated her for back and leg pain after one of the accidents, and Dr. Howard treated her for neck pain after the other accident (Tr. p. 433). Utley testified that her neck is always tight and she has "migraines from [her] neck" (Tr. p. 433). Utley testified that she fell the night before the administrative hearing, which hurt her back and leg and caused her to move around a lot during the hearing (Tr. p. 434). Utley also testified that her stomach was swollen when she woke up that morning (Tr. p. 434).

The VE testified that Utley's past relevant work as a convenience store clerk was light, SVP 2, and unskilled, her work as an auto parts clerk was heavy, SVP 3, and semiskilled, her work as a general office clerk was light, SVP 2, and semiskilled, her work as a stroller rental clerk was light, SVP 2 and unskilled, and her work at the uniform company as an emblem tender was light, SVP 2 and unskilled (Tr. pp. 436-437).

The ALJ posed a hypothetical to the VE concerning a person age 36 to 38 years old, who has a GED, and who can lift/carry up to 20 pounds occasionally and ten pounds frequently, stand or walk up to two hours in an eight hour day, and sit six hours in an eight hour day, can push and pull, but cannot climb ladders, ropes or scaffolds, and all other postural abilities are only occasional, and should work with things rather than people and not have direct contact with the public (Tr. p. 439). The VE testified that such a person could not do any of Utley's past relevant work because an auto parts clerk and a rental clerk has substantial contact with

the public, and the emblem tender (assembly line work) would usually involve too much standing (Tr. p. 439).  The VE testified that such a person could work as an auditing and bookkeeping clerk (U.S. Census 2000, Code 512, sedentary, unskilled), or general office clerk (U.S. Census 2000, Code 586, unskilled, sedentary, 1,726 jobs in Louisiana less 25% due to physical limitations, 136,373 jobs nationally less 25% due to physical limitations). General office clerk included jobs such as microfilm preparer (sedentary, SVP 2) or press clipper clerk (Tr. pp. 439-441, 445).

The VE testified that the same person with the same physical limitations but without any mental limitations would be able to work as a pari mutuel[2] ticket checker (U.S. Census 2000, Code 512, sedentary, unskilled, 1067 jobs in Louisiana and 74,457 jobs nationally), or a telemarketing clerk (U.S. Census 2000, Code 494, 2095 jobs in Louisiana and 414, 575 jobs nationally).

The ALJ again modified the hypothetical to a person who can lift/carry less than ten pounds, stand/walk up to two hours in an eight hour day, sit up to six hours in an eight hour day, and must have a sit/stand option every thirty minutes to one hour (Tr. p. 442).  The VE testified that such a person can work as a telemarketer, a general office clerk, an auditing type clerk, or a pari mutuel ticket checker (Tr. p. 442).

The VE further testified that, if the person has mental limitations (not working with people or the public), the person

---

[2] The transcriptionist misspelled "peri mutuel" as "paramutual."

12

could not work as a telemarketer or a pari mutuel ticket checker (Tr. p. 442). Such a person could work as a title mortgage accounting clerk (U.S. Census 2000, Code 512, semiskilled, SVP 3, 5335 jobs in Louisiana reduced by 50% for mental limitations and 372,283 jobs nationally reduced by 50%), an unskilled general office clerk, such as microfilm preparer or press clipping, or a semi-skilled general office clerk such as a data examination clerk or sorter (sedentary, semiskilled, 13,232 jobs in Louisiana). The VE testified there were 1,045,529 sedentary, semi-skilled general office clerk jobs in the nation (Tr. p. 444).

The ALJ posed a final hypothetical involving a person who is unable to maintain work activity eight hours a day, five days a week on a continuing, sustained basis. The VE testified that such a person would not be able to hold any job (Tr. p. 446). The VE further testified that, if the person could not alternate sitting and standing for eight hours a day with normal breaks or if she had to lie down during the day, there would not be any jobs she could do (Tr. p. 446).

### ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Utley (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can

perform any other type of work.  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy.  Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Utley has not engaged in substantial gainful activity since May 11, 2003, that her disability insured status expired on September 30, 2008, and that she has severe impairments of "status post burst fracture with fusion, chronic pain and depression," but that she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. pp. 16-17).  The ALJ also found that Utley is unable to perform any of her past relevant work as a convenience store clerk, an auto parts clerk, a rental clerk, and an emblem tender (Tr. p. 21).

At Step No. 5 of the sequential process, the ALJ further found that Utley has the residual functional capacity to perform

sedentary except as reduced by her need to be able to alternate sitting and standing every thirty minutes to an hour (without leaving the work area), the fact that she should work with things rather than people, and her inability to have direct contact with the public (Tr. p. 18). The ALJ found the claimant is a younger individual with at least a high school education and no transferable work skills (Tr. p. 21). The ALJ concluded there are a significant number of jobs in the national economy which Utley can perform, such as auditing bookkeeping clerk, general office clerk, press clipping clerk, and microfilming preparer and, therefore, Utley was not under a "disability" as defined in the Social Security Act at any time through the date of the ALJ's decision on March 3, 2010 (Tr. p. 22).

### Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence

15

which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981). Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. Dellolio, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

Law and Analysis

Issue 1 - Listing 1.04

First, Utley contends the ALJ erred in failing to discuss why she did not find that Utley meets the requirements of 20 C.F.R. part 404, Subpart P, Appendix 1, Section 1.04 (Listing 1.04). Although the ALJ specifically stated she considered the Listings in

16

Section 1.00 and found them inapplicable to Utley (Tr. p. 17), she did not discuss her reasoning.

If the claimant's condition is listed, or is medically equivalent to a listed impairment, the claimant is conclusively determined disabled. Cieutat v. Bowen, 824 F.2d 348, 351 n.1 (5th Cir. 1987). Also, Selders v. Sullivan, 914 F.2d 614, 619 n. 1 (5th Cir. 1990). A claimant has the burden of proving that his condition meets or equals an impairment listed in Appendix 1. Sullivan v. Zebley, 493 U.S. 521, 110 S.Ct. 885, 891-92, 107 L. Ed. 2d 967 (1990). See also, Selders v. Sullivan, 914 F. 2d 614, 619(5th Cir. 1990). For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify. Sullivan v. Zebley, 110 S. Ct. at 891.

The ALJ should identify the listed impairment for which the claimant's symptoms fail to qualify and provide an explanation as to how he/she reached the conclusion that the claimant's symptoms are insufficiently severe to meet any listed impairment. A bare and summary conclusion that a plaintiff does not meet the criteria of any listing is beyond meaningful judicial review. Audler v. Astrue, 501 F.3d 446, 448 (5th Cir. 2007), and cases cited therein.

Listing 1.04 states:

"Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

17

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
> B. Spinal arachnoiditis...; or
> C. Lumbar spinal stenosis resulting in pseudoclaudication... .

Since there is no evidence of either spinal arachnoiditis or lumbar spinal stenosis, only Subsection A-nerve root compression, appears to be applicable to Utley.

However, there is no evidence that Utley has nerve root compression. Although Utley relies on the finding of spinal stenosis in 2004, prior to her second, corrective surgery, tests subsequent to the second surgery indicated there was no nerve root compression. In August 2004, Dr. Nanda found that, after her second surgery, Utley had good motor strength in her upper and lower extremities with normal reflexes, and a myelogram/CT scan showed excellent decompression with no nerve root compromise (Tr. p. 230). In April 2007, CT scans showed post-surgical changes to T12-L1 and L2, but no significant compression (Tr. pp. 198-204). In May 2008, x-rays and CT scans showed a stable fusion and no acute lumbar spine findings, in June 2008 Utley had a stable lumber spine and no acute changes to explain Utley's radiculopathy (Tr. pp. 256-258, 322-323), and in October 2008 Utley had some degenerative changes at C5-C6 but unremarkable lower lumbar levels and sacrum in October 2008 (Tr. pp. 249, 251). In February 2009, Dr. Dewitt found Utley's lumbar spine had flexion decreased at 70 degrees, but lateral flexion to the right and left were normal,

18

extension was normal, her hip range of motion had normal internal rotation, external rotation, abduction and extension, but flexion at the left hip was decreased to 30 degrees secondary to pain (though the joint did not stop at 30 degrees), and straight leg raising was negative on the right and positive on the left at 30 degrees in the supine position, and negative on both the right and the left in the sitting position (Tr. p. 342). Dr. Dewitt further found equal bilateral motor strength at 5/5 in the lower extremities (except the left knee flexion strength was 4/5 secondary to pain), and there were no signs of muscle atrophy (Tr. p. 342). An EMG and a nerve conduction study in July 2009 were normal for Utley's upper extremity EMGs, while her lower extremity EMGs were consistent with a mild, right S1 radiculopathy (Tr. p. 361, 364). Although Utley points to Dr. Leglue's finding of motor loss a few days after she was involved in an automobile accident in November 2008, it is noted that Dr. Leglue did not test Utley's lumbar range of motion, and though he found decreased sensation to pin pricks in the left lower extremity diffusely and a positive straight leg raise test (without noting which side and whether the test was supine or sitting), he diagnosed only "possible lumbar radiculopathy."

Utley has not carried her burden of proving she meets Listing 1.04 because she has not proven she has nerve root compression with motor loss, and sensory or reflex loss, which meets the listing. Since the evidence does not show that Utley meets or equals Listing 1.04, Utley cannot show she was prejudiced by the fact that the ALJ

did not discuss her reasoning in reaching that conclusion.

This issue is meritless.

Issue 2 -Vocational Expert's Testimony

Utley also contends the vocational testimony did not carry the Commissioner's burden of proof at the final step in the sequential evaluation process.

Once the ALJ determines that a claimant suffers from a nonexertional impairment that prevents him from performing his past relevant work, the Commissioner must produce expert vocational testimony or other similar evidence to establish that other jobs exist in the national economy that the claimant can perform. Fields v. Bowen, 805 F.2d 1168, 1170 (5th Cir. 1986), and cases cited therein. The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed. A vocational expert is able to compare all the unique requirements of a specified job with the particular ailments a claimant suffers in order to reach a reasoned conclusion whether the claimant can perform the specific job.  Fields, 805 F.2d at 1170.

The Social Security Act, 42 U.S.C. §423(d)(2)(A) provides that "'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several other regions of the country.  It does not matter whether (1) Work exists in the immediate area in which you live; (2) A specific job vacancy exists for you; or (3) You would be hired if you applied for work."  Section 404.1566(b)

further states:

> "Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications. Isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered 'work which exists in the national economy.'"

The vocational expert[3] testified that, pursuant to the limitations the ALJ assigned to Utley (sedentary work except as reduced by her need to be able to alternate sitting and standing every thirty minutes to an hour without leaving the work area, and the fact that she should work with things rather than people and her inability to have direct contact with the public), Utley could not work as an auditing and bookkeeping clerk (such as a peri mutuel ticket checker) because that job involves a lot of contact with the public. However, the VE found she could work as a general office clerk, for example as a microfilming preparer or a press clipping clerk.

The VE testified that, for the general office clerk job at the sedentary, unskilled level (U.S. Census 2000, Code 586, unskilled, sedentary), there are 1726 jobs in Louisiana and 136,373 jobs nationally, both reduced by 25% given Utley's functional limitations. The VE further testified that "general office clerk" includes jobs such as microfilm preparer (sedentary, SVP 2) and

---

[3] The VE's curriculum vitae was not included in the record, and there does not appear to be a licensed vocational rehabilitation counselor in Louisiana named "John Yants." Therefore, the record does not show that Yants has the credentials necessary to qualify as a vocational expert in this case.

press clippings clerk (Tr. pp. 441-441, 445).[4]  The VE testified that the numbers of general office clerk jobs would be reduced by 25% if the worker requires a sit/stand option and must avoid working with people and avoid contact with the public (Tr. p. 441).

Utley contends the VE failed to provide numbers of jobs existing in the regional and national economies for "microfilm preparer" and "press clipping clerk."  However, the VE stated that the Department of Labor does not publish specific data on the availability of particular "occupational populations," so "there is no way of tracking an individual DOT title to a certain population for that work in the economy."  The VE testified that the jobs of "microfilm preparer" and "press clippings clerk" were examples of the types of jobs available in "general office clerk" work, which is the work he provided job numbers for.  Therefore, the precise numbers of the example jobs was not necessary.  The confusion here appears to stem from the fact that the ALJ found Utley can do work as a "microfilm preparer" or a "press clippings clerk" (the examples of unskilled, sedentary general office clerk work given by the VE) instead of finding she can work as a "general office clerk," which is what the VE testified she could do.

However, the job of "general office clerk," otherwise known in the DOT as "administrative clerk" is a light work job.  See DOT 219.362-010.  Likewise, the job of "clerk, general," DOT 209.562-010 is also light work.  Therefore, the general office clerk job is

---

[4] It is noted that, under the DOT, a "document preparer, microfilming, 249.587-018" does not fall within the category of "general office clerk."

unsuitable for Utley, who was limited by the ALJ to sedentary work, and does not support the ALJ's/Commissioner/s finding that Utley is not disabled.

In the alternative, to the extent the VE may have referred to "general office clerk" jobs as a broad category of jobs, and cited "microfilm preparer" and "press clippings clerk" as specific unskilled, sedentary jobs within that category that Utley could perform, the VE failed to set forth the numbers of those jobs existing in the national and regional economies. Therefore, the VE's testimony still does not support the ALJ's/Commissioner's finding that there is a significant number of jobs existing in the regional or national economies that Utley can perform.

Under either interpretation of the VE's testimony, substantial evidence does not support the ALJ's conclusion that Utley is not disabled. Since substantial evidence does not support the conclusion of the ALJ/Commissioner, their decision is incorrect as a matter of law. However, this does not entitle Utley to a decision in her favor based upon the existing record. The record is simply inconclusive as to whether there are any jobs existing in sufficient numbers in the regional or national economies which Utley can perform. Therefore, Utley's case should be remanded to the Commissioner for further proceedings.

<u>Conclusion</u>

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be VACATED and that Utley's case be REMANDED to the Commissioner for further proceedings.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN fourteen(14) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this _____ day of March 2012.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE